IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez

Civil Action No. 19-cv-1246-WJM-STV

PAMELA STONE,
TWYLA RUSAN,
M. JAMIE MORROW, and
THE SOUTH PARK COALITION, INC.,

    Plaintiffs,

v.

HIGH MOUNTAIN MINING COMPANY, LLC, and
JAMES R. MURRAY,

    Defendants.

---

**ORDER DENYING PLAINTIFFS' EARLY MOTION FOR PARTIAL SUMMARY JUDGMENT ON LIABILITY FOR CULVERT DISCHARGES**

---

This matter is before the Court on Plaintiffs Pamela Stone, Twyla Rusan, M. Jamie Morrow, and the South Park Coalition, Inc.'s (collectively, "Plaintiffs") Early Motion for Partial Summary Judgment on Liability for Culvert Discharges (the "Motion"). (ECF No. 38.)  For the reasons that follow, the Motion is denied.

## I.  STANDARD OF REVIEW

Summary judgment is warranted under Federal Rule of Civil Procedure 56 "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986).  A fact is "material" if, under the relevant substantive law, it is essential to proper disposition of the claim.  *Wright v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001).  An issue is "genuine" if

the evidence is such that it might lead a reasonable trier of fact to return a verdict for the nonmoving party. *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997).

In analyzing a motion for summary judgment, a court must view the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). In addition, the Court must resolve factual ambiguities against the moving party, thus favoring the right to a trial. *See Houston v. Nat'l Gen. Ins. Co.*, 817 F.2d 83, 85 (10th Cir. 1987).[1]

## II. BACKGROUND

### A.   Factual Allegations[2]

Defendant High Mountain Mining Company, LLC ("HMM") owns and operates the Alma Placer Mine (the "Mine"). (ECF No. 38 at 3 ¶ 4.) James R. Murray is one of the managing members of HMM. (ECF No. 48-1 ¶ 6.)

---

[1] In their reply, Plaintiffs cite *Adler* for the proposition that on a motion for summary judgment, "the burden shifts to the nonmovant to go beyond the pleadings and 'set forth specific facts' that would be admissible in evidence in the event of a trial from which a rational trier of fact could find for the nonmovant." (ECF No. 59 at 10–11.) In these circumstances Plaintiffs are mistaken. This burden-shifting applies only when: (1) the movant carries its initial burden; and (2) the nonmovant bears the burden of persuasion at trial. *Adler*, 144 F.3d at 671. As the movant who also bears the burden of persuasion at trial, it is Plaintiffs' burden—not Defendants'—to establish in its Motion that there are no genuine disputes as to any material fact.

[2] The following factual summary is based on the parties' briefs on the Motion and documents submitted in support thereof. These facts are undisputed unless attributed to a party or source. All citations to docketed materials are to the page number in the CM/ECF header, which sometimes differs from a document's internal pagination.

1.  Overview of the Mine's Operations

The Mine is a sand and gravel operation and placer gold mine located east of Alma in Park County, Colorado. (ECF No. 38 at 4 ¶ 6; ECF No. 48 at 5 ¶ 6.) The Mine is adjacent to the Middle Fork of the South Platte River ("Middle Fork"). (ECF No. 38 at 4 ¶ 8; ECF No. 17-1 at 21.)

HMM processes approximately 100,000 cubic yards of gravel each year. (ECF No. 48 at 10 ¶ 6(d).) According to HMM's General Mining Plan,

> All gold process is accomplished various forms of density separation and no chemical processing treatments are used on-site. Two sets of gold processing equipment will operate next to active pit areas and are composed of a trommel, grizzly, and sluice system. The processing building, located near the center of the permit area, houses a spiral and hydrocyclone used to further process for gold. Water used in on-site sluices and within the processing building is discharged into settling ponds 1–4 in sequential order.
> . . .
>
> Only water is used in processing the gold and gravel. Most gold-bearing gravel is expected to be located below the water table; therefore, a pump will be located below the working area in each mining area to dewater the pit prior to mining. It is expected that inflows to the pump will be approximately 50–100 gallons per minute. This amount will be pumped from the pit to the sediment pond system.

(ECF No. 17-1 at 28–29.) The "system of 4 ponds is located in the lower southwest corner of the permit area to provide for pit water seepage back into the ground as well as capacity to withhold the 100 year runoff." (ECF No. 38-1 at 66.)

Defendants contend that although the ponds do not have synthetic liners, the ponds have a significant proportion of "clay fines" within them that serve as natural liners and "prevent infiltration." (ECF No. 48 at 10 ¶ 6(g).) According to Defendants,

they "are not aware of any evidence that any water has ever seeped out of ponds 1, 2, 3, and 4" and state that "[w]ater leaves the ponds only by recycling to the sluice [and by] evaporation."  (*Id.* at 11 ¶¶ 6(g)–(h); ECF No. 48-1 at 1 ¶ 12.)

By contrast, Plaintiffs contend that water from the ponds "seep[s] and spill[s]" and "contribute[s] to a wetlands area located on the Mine property" that flows to two culverts (the "North and South Culverts") and into the Middle Fork.  (ECF No. 38 at 4–5 ¶¶ 12–13; ECF No. 59 at 5 ¶ 6(i).)  In support of these assertions, Plaintiff Pamela Stone and Doris Ledue, a member of Plaintiff The South Park Coalition, Inc., submitted affidavits averring that they have seen that the culverts move water from the Mine property into the Middle Fork.  (ECF No. 20-3 at 2 ¶ 6; ECF No. 20-7 at 2 ¶ 6.)

2. <u>Sampling of Water In or Around the Mine Site</u>

In July 2016, HMM contracted Arrakis, Inc. ("Arrakis") to perform water quality testing at the Mine site.  (ECF No. 38 at 5 ¶ 15; ECF No. 38-3 at 1.)  Arrakis analyzed ten water samples in "areas where running water was observed entering the mine site, flowing across the mine site, and leaving the mine site."[3]  (ECF No. 38-3 at 1.)  Plaintiffs contend that Arrakis's sampling shows barium, cadmium, potassium, magnesium, sodium, and silica located in the North and/or South Culverts.  (ECF No. 38 at 5 ¶ 19.)

Thereafter, in November 2016, Alison Burchell, a geologist and geochemist, was retained to conduct water sampling at four sites: "MF1 Culvert 1, MF2 West Alma Upstream, MF3 1000 feet downstream of Culvert 1, and MF4 Culvert 2."  (ECF No. 20-4

---

[3] Eric Fritz, Arrakis's operations manager, submitted a declaration stating that he and his co-worker did not sample any water that could have been "created or affected by operations at the Mine, or that ran from the surface of the Mine to any area outside of the Mine."  (ECF No. 48-4 at 1 ¶ 12.)

at 11.) Ms. Burchell concluded the following:

> [I]nstream chemistry along the reach of the Middle Fork, which is influenced by Culverts 1 and 2, varied from samples analyzed upstream and downstream. Notably, magnesium, potassium, and sodium concentrations were elevated, which I now understand were detected in high concentration in the Mine settling ponds. Sulfur, carbon and uranium concentrations are also elevated along this reach of the Middle Fork as compared to upstream samples.
>
> It is my opinion that Ponds 3 and 4, located 23.4' from the Middle Fork, are a likely additional source of contamination into the River. Ponds 3 and 4 are designed to settle out fine sand from Mine operations while temporarily detaining Mine operation waters and fugitive metals or other contaminants. According to the [Mine], . . . processing at the site includes the use of portable trommels and sluice boxes, with water discharge allowed to settled in the first catchment, and then directed to ponds, including Ponds 3 and 4, which are designed to "allow for infiltration of water into the native grounds." That water, and associated contaminants, is eventually conveyed into the groundwater system and, thence, to the Middle Fork adjacent to these ponds.

(*Id.* at 11–12.)

**B.      Procedural History**

On April 29, 2019, Plaintiffs filed this lawsuit against Defendants HMM and Murray, seeking: (1) an order declaring Defendants to be in violation of the Clean Water Act ("CWA"); (2) the imposition of civil penalties on Defendants; and (3) an injunction ordering Defendants to seek a permit and to rehabilitate the Middle Fork. (ECF No. 1.)

On June 28, 2019, Defendants moved to dismiss the complaint under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). (ECF No. 17.) On February 12, 2020, the Court: (1) dismissed Plaintiff Be The Change USA's claim without prejudice; (2) reserved ruling on whether Plaintiffs have plausibly alleged that Defendants' discharges

flowing from the settling pounds into the groundwater, and from the groundwater into the Middle Fork, constitute a violation of the CWA; and (3) denied the motion in all other respects.  (ECF No. 35 at 8–9, 18–19.)

On March 4, 2020, Plaintiffs filed the Motion.  (ECF No. 38.)  Defendants responded on April 8, 2020 (ECF No. 48), and Plaintiffs replied on May 6, 2020 (ECF No. 59).

### III.  ANALYSIS

The CWA prohibits the discharge of any pollutant from a point source unless authorized by a permit issued under the National Pollutant Discharge Elimination System ("NPDES").  *See* 33 U.S.C. §§ 1311(a), 1342.  To establish a violation of these sections, Plaintiffs must prove that Defendants: (1) discharged (2) a pollutant (3) into navigable waters (4) from a point source (5) without a permit.  *Sierra Club v. El Paso Gold Mines, Inc.*, 421 F.3d 1133, 1142 (10th Cir. 2005) (citing *Nat'l Wildlife Fed'n v. Gorsuch*, 693 F.2d 156, 165 (D.C. Cir. 1982)).  Under the CWA, a "discharge of a pollutant" is defined as "any addition of any pollutant to navigable waters from any point source."  33 U.S.C. § 1362(12).

Plaintiffs have moved for early summary judgment regarding their claim that Defendants are charging pollutants into the Middle Fork through the North and South Culverts without a NPDES permit.[4]  (ECF No. 38 at 7.)  Plaintiffs argue that there is no

---

[4] The Court notes that Plaintiffs appear to be misusing the procedural mechanism that is an Early Motion for Partial Summary Judgment.  The Early Motion for Partial Summary Judgment is intended to reduce the claims or issues in the case.  *See* WJM Revised Practice Standard III.E.2.  Here, even though Plaintiffs are only seeking summary judgment on one of their theories of unpermitted discharge (*see* ECF No. 38 at 2 n.1), a ruling in Plaintiffs' favor would ultimately require the Court to grant summary judgment in favor of Plaintiffs on their

genuine dispute that the Defendants are discharging pollutants into the Middle Fork through the North and South Culverts. (*Id.*) In response, Defendants argue that Plaintiffs cannot meet their burden in establishing how waters from the Mine moved "from a pond and to the culverts" into the Middle Fork. (ECF No. 48 at 13.) The Court agrees with Defendants.

There are substantial genuine disputes of material fact about whether, and how, water travels from the Mine and into the Middle Fork. For example, Plaintiffs argue that the Mine's unlined ponds allow water to "seep back into the ground" into wetlands on the Mine's property, flow through the North and South Culverts beneath Highway 9, and then flow into the Middle Fork. (ECF No. 38 at 7–8.) In support of this theory, Stone and Ledue provide declarations averring that they have personally seen the culverts carry water from the Mine property into the Middle Fork. (ECF No. 20-7 at 2 ¶ 6; ECF No. 20-3 at 2 ¶ 6.)

Plaintiffs may well have seen water in the North and South Culverts. However, these affidavits do not demonstrate that this water emanated from the Mine itself.[5]

---

CWA claim—*i.e.*, the only claim listed in the Complaint (ECF No. 1 at 11). Thus, through the Motion, Plaintiffs are effectively seeking all of the relief they seek in this action, albeit indirectly. As made clear in RPS III.E.2., even with the filing of this Motion, Plaintiffs retain the right to file another motion for summary judgment on the full merits, after the conclusion of all discovery. Plaintiffs are on notice that this is not the intended purpose for an Early Motion for Partial Summary Judgment before this Court. The Court will not, however, take any further action on this matter at this time.

[5] In their reply, Plaintiffs provided a new affidavit from Pamela Stone stating that: (1) she knows where HMM's property boundaries are located; and (2) she "can state with certitude" that the water flowing through the North and South Culverts comes from HMM's property. (ECF No. 59-1.) Because this evidence was introduced for the first time on reply, the Court will not consider it. *United States v. Harrell*, 642 F.3d 907, 918 (10th Cir. 2011) ("[A]rguments raised for the first time in a reply brief are generally deemed waived.").

Defendant Murray submitted an affidavit stating that HMM's property contains natural drainage from snowmelt and other natural water that "does not cross the Mine or any area on the [p]roperty where mining occurs." (ECF No. 48-1 at 2 ¶ 15.) He further contends that the Mine's ponds utilize a "silt/clay lining [that] prevent[s] infiltration" and states that he is unaware "of any evidence that any water has ever seeped out of ponds 1, 2, 3, and 4 at the Mine." (*Id.* at 1 ¶¶ 11–12.) Discovery is needed to determine: (1) the source of the water in the North and South Culverts; and (2) whether it is possible for water to seep or flow from Mine's ponds to the North and South Culverts.

Even assuming that the water flowing through the North and South Culverts emanates from the Mine, there are also substantial disputed material facts about whether the pollutants identified in the Middle Fork can be traced to HMM's property. *See Sierra Club*, 421 F.3d at 1146 (recognizing that the "CWA requires a connection or link between discharged pollutants and their addition to navigable waters"). Plaintiffs contend that Arrakis's 2016 sampling "demonstrates that relatively substantial levels of pollutants are leaving the Mine." (ECF No. 38 at 10–11.) Arrakis's report states that it had conducted sampling "in areas where running water was observed entering the mine site, flowing across the mine site, and leaving the mine site." (ECF No. 38-3 at 1.) However, Eric Fritz, Arrakis's operations manager who conducted the sampling, stated the following in a declaration submitted to the Court:

> 12. Mr. Berkley and I sampled no water that could have been created or affected by operations at the Mine, or that ran from the surface of the Mine to any area outside of the Mine.
>
> 13. I understand that Plaintiffs have alleged that I sampled water leaving the Mine and that this is stated in my report.

>This is not true.
>
>14. I have never observed water leaving the Mine and have never sampled water leaving the Mine.

(ECF No. 48-4 at 1 ¶¶ 12–14.) Further discovery is needed to resolve key factual questions about which waters Arrakis sampled, and whether there is a link between pollutants discharged on the Mine property and pollutants identified in the Middle Fork.[6]

Thus, because there are substantial and genuine disputes of material fact remaining, Plaintiffs are not entitled to summary judgment on their CWA claim at this time.

## IV. CONCLUSION

For the reasons set forth above, Plaintiffs' Early Motion for Partial Summary Judgment on Liability for Culvert Discharges (ECF No. 38) is DENIED.

Dated this 19th day of November, 2020.

BY THE COURT:

William J. Martínez
United States District Judge

---

[6] For example, the parties similarly dispute the impact of Ms. Burchell's water sampling. She concluded that sections of the Middle Fork contained elevated levels of magnesium, potassium, sodium, sulfur, carbon, and uranium. (ECF No. 20-4 at 11.) In response, Defendants argue that the pollutants "found by Ms. Burchell are consistent with magnesium chloride which [the Colorado Department of Transportation] uses on the adjacent Highway 9 to control ice buildup." (ECF No. 48 at 8 ¶ 20.)