IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez

Civil Action No. 19-cv-1246-WJM-STV

PAMELA STONE, an individual,
TWYLA RUSAN, an individual,
M. JAMIE MORROW, an individual, and
THE SOUTH PARK COALITION, INC., a non-profit 501(c)(4) Colorado corporation,

    Plaintiffs,

v.

HIGH MOUNTAIN MINING COMPANY, LLC, a Wyoming limited liability company, and
JAMES R. MURRAY, an individual,

    Defendants.

## ORDER ON PENDING MOTIONS

This matter is before the Court on the following motions:

- Defendants High Mountain Mining Company, LLC ("High Mountain"), and James R. Murray's (jointly, "Defendants") Motion to Exclude Certain Opinions of Plaintiffs' Retained Expert Witnesses Under Fed. R. Evid. 702 ("Defendants' Motion to Exclude Retained Experts") (ECF No. 83);

- Defendants' Motion to Exclude Plaintiffs' Non-Retained Expert Witnesses Under Fed. R. Evid. 702 ("Defendants' Motion to Exclude Non-Retained Experts") (ECF No. 84);

- Plaintiffs Pamela Stone, Twyla Rusan, M. Jamie Morrow, and the South Park Coalition, Inc.'s (collectively, "Plaintiffs") Motion to Exclude Certain Opinions of Defendants' Retained Experts Greg Lewicki and James R. Murray Under FRE

702 ("Plaintiffs' Motion to Exclude") (ECF No. 87); and

- Defendants' Motion for Summary Judgment (ECF No. 105).

The Court presumes familiarity with the procedural and factual background of this action, which will not be repeated here. For the reasons set forth below, the Court grants in part and denies in part Defendants' Motion to Exclude Non-Retained Experts and denies Defendants' Motion to Exclude Retained Experts, Plaintiffs' Motion to Exclude, and Defendants' Motion for Summary Judgment.

## I. PLAINTIFFS' MOTION TO EXCLUDE

### A. Legal Standards

A district court must act as a "gatekeeper" in admitting or excluding expert testimony. *Bitler v. A.O. Smith Corp.*, 400 F.3d 1227, 1232 (10th Cir. 2005). "The goal of a Rule 702 analysis is to make certain that an expert, whether basing testimony on professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Clifton v. State Farm Mut. Aut. Ins. Co.*, 2021 WL 1100403, at *1 (D. Colo. Mar. 23, 2021) (quotation marks omitted).

Expert opinion testimony is admissible if it is relevant and reliable. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589, 594–95 (1993). The opinions are relevant if they would "assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. They are reliable if (1) the expert is qualified "by knowledge, skill, experience, training, or education," (2) his opinions are "based upon sufficient facts or data," and (3) they are "the product of reliable principles and methods." *Id.* "Nothing in either *Daubert* or the Federal Rules of Evidence requires a

2

district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Crest Exteriors, LLC v. Am. Fam. Mut. Ins. Co.*, 2020 WL 8181823, at *4 (D. Colo. Oct. 27, 2020). The proponent of expert testimony has the burden to show that the testimony is admissible. *United States v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009).

In addition to assessing whether expert opinions are reliable, the Court must also ensure that the proffered testimony will assist a trier of fact. *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 156 (1999). "Relevant expert testimony must logically advance[ ] a material aspect of the case and be sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *United States v. Garcia*, 635 F.3d 472, 476 (10th Cir. 2011) (internal quotation marks and citations omitted).

**B.   Analysis**

Defendant has endorsed two rebuttal expert witnesses: retained expert Greg Lewicki, an engineer, and non-retained expert James R. Murray, a managing member of High Mountain. (ECF No. 87.)

Among other things, Lewicki opines that all of High Mountain's ponds ("Mine Ponds") have a clay lining which prevents infiltration and that:

> [c]lay liners are used frequently to accomplish sealing of ponds in both regular civil infrastructure and the mining industry. In particular, such liners are used in locations where the material for them is readily available at their construction site (Exhibit 11). In the cases where clay liners are to be installed all at once, compaction via mechanical means is necessary. Compacted clay liners of this type are built in condensed timeframes. The key to the mechanical installation is placing the clay in limited thicknesses (lifts) and compacting (applying downward pressure) each lift prior to placing the next lift.

> The clay lining found in the process water ponds at the Alma Placer Mine [the "Mine"] is installed in the same manner, albeit using the aid of water instead of a bulldozer or compactor. Process water enters the pond bearing suspended silts and clays. The clays and silts, being denser than the water, settle into the bottom and sides of the pond in a thin lift. The layer is then compacted into place via the pressure of the water in the pond. Each introduction of process water contributes another lift to the clay liner of the pond and compacts it under water pressure. Initial lifts will be compacted into the host cemented glacial till, filling in initial pore space. Following lifts further augment the liner, leading to self-sealing as noted by [the Colorado Division of Reclamation, Mining and Safety ("DRMS")] in 2003 & 2005 (Exhibits 8 & 9). This can be seen in Ponds 3 & 4 (formerly known as Pond "A" or even Pond "1") which have been continuously clay lined since at least the early 1990's. Further information regarding the natural cementation of the native material and high clay content is discussed in Item 4.

(ECF No. 87-1 at 12.) Likewise, Murray plans to testify that "sufficient silt and clay is left in the [Mine Ponds] to maintain a silt/clay lining to prevent infiltration." (ECF No. 87-2 at 1.)

Pursuant to Rule 702, Plaintiffs seek to exclude "all testimony pertaining to [Lewicki's] and [Murray's] opinions that clay in the process water creates a lining for High Mountain's setting ponds and prevents the seepage of water through the sides or bottoms of these ponds." (ECF No. 87 at 4.) Plaintiffs argue that neither Lewicki nor Murray have produced "any measurements of the sides or bottoms of the [Mine Ponds] . . . to confirm that clay is present in '[a]ll ponds'"; that they have "never tested their theory that the alleged clay lining has prevented infiltration"; and that they "have disclosed no photographs of the clay and on the sides or bottoms of the ponds, even though a pond could have been temporarily drained to do so." (*Id.* at 5.) Plaintiffs further point out that Defendants' expert witnesses do not reference any scientific

4

studies to support their "application of clay through water" theory. (*Id.*) Defendants respond that Lewicki's report and Murray's disclosures identify sufficient bases for their opinions. (ECF No. 98 at 2, 8–10.)

After carefully reviewing the parties' briefs and the exhibits appended thereto, the Court concludes that Lewicki's report and Murray's disclosures sufficiently identify the bases for their rebuttal expert opinions. Notwithstanding the fact that Plaintiffs can envision ways that Lewicki and Murray could have further supported their expert opinions—*i.e.*, by producing measurements of the sides or bottoms of the Mine Ponds, by engaging in modeling to determine the percentage of clay in the silt/clay process water, or by temporarily draining a Mine Pond to photograph the clay lining—the Court has not been presented with any evidence or case law demonstrating that the absence of these techniques render the experts' opinions unreliable. To the contrary, the Court is confident that any perceived insufficiencies in Lewicki's and Murray's expert opinions can be adequately explored through cross-examination at trial.

Accordingly, the Court denies Plaintiffs' Motion to Exclude.

## II. DEFENDANTS' MOTION TO EXCLUDE RETAINED EXPERTS

In Defendants' Motion to Exclude Retained Experts, Defendants seek to exclude certain expert opinions of Plaintiffs' retained expert witnesses: Alison Burchell, Weston W. Wilson, and Carla Johnson. (ECF No. 83.)

### A. Relevant Opinions of Plaintiffs' Retained Expert Witnesses

1. <u>Burchell</u>

Burchell, a field geologist and geochemist with experience in water quality sampling, has submitted an expert report in which she opines, *inter alia*:

- "As evidenced from published geological maps [of] standing wetlands, wetland vegetation and as confirmed during site-reconnaissance, the [Middle Fork] is a 'gaining' stream that maintains well-sustained flow year-round with a water table that is maintained at or above stream level as run-off and regional ground water generally moves toward and into the stream. . . .  The High Mountain Site and associated settling ponds are 'perched' at higher elevation than the natural stream bed."

- "On November 5, 2016, I conducted water quality sampling at four locations: [MF1: Culvert 1; MF2: West Alma Upstream; MF3: 1,000 feet downstream of Culvert 1; and MF4: Culvert 2]. . . .  The culverts were selected for sampling because: (i) I had observed what appeared to be water seeping from – and ponding near the base of settling pond, (ii) I had been denied permission to survey or sample the site, and (iii) I observed that these two culverts conveyed water from the High Mountain site which then flows into the Middle Fork . . . ."

- "[I]nstream chemistry along the reach of the Middle Fork, which is influenced by Culverts 1 and 2, varied notably from samples analyzed upstream and downstream.  The sampling data indicate that the High Mountain site is likely discharging elevated levels of cations into the Middle Fork through Culverts 1 and 2, notably magnesium (Mg), potassium (K), and sodium (Na) which I now understand were detected in high concentration in at least one mine settling pond.  The levels [*sic*] sulfur (S), carbon (C) and uranium (U) are also higher along this reach of the Middle Fork as compared to sample[s] taken upstream and downstream from the section of the Middle Fork adjacent to the High Mountain site."

- "According to the Alma Placer Mine, 112 Permit Amendment to Colorado Mined Land Reclamation Division and Park County, Colorado, April 2016 [("April 2016 Permit Amendment")], processing at the site includes the use of portable trommels and sluice boxes, with water discharge allowed to settle in the first catchment, and then directed to ponds, including Ponds 3 and 4, which are designed to 'allow for infiltration of water into the native gravels.'  That water is then conveyed into the groundwater, and, thence, to the Middle Fork adjacent to these ponds."

- "Based on information submitted by Defendants[,] the

- settling ponds do not have compacted synthetic liners and rely on a thick layer of accumulating clays to impede groundwater infiltration.  To permanently seal the [Mine Ponds], the clay fines would need to have been applied in a uniform and methodical manner, dried and then machine hard-compacted."

- "These sampling data [*sic*], demonstrate the presence of pollutants in the Mine Ponds and that the Mine Ponds are likely discharging into the Middle Fork (i) through the alluvium below the [Mine] Ponds, and (ii) possibly through the sides and bottom of the [Mine] Ponds resulting in observed standing water or wetlands at the edge of the Mine property and which subsequently discharge through the culverts into the Middle Fork."

(ECF No. 83-2.)

2.   <u>Wilson</u>

Wilson was employed by the United States Environmental Protection Agency between 1974 and 2010 and has "analyzed surface water quality impacts associated with mining and other resources extraction activities."  (ECF No. 83-1 at 3.)  In his expert report, he provides the following expert opinions:

- "The Middle Fork . . . is a gaining stream where ground water flows into [the] Middle Fork.  This high mountain stream gains water which is demonstrated by the presence of aquatic plants such as willows at a higher elevation than the stream bank and that water in the culverts flows clear and from a higher elevation than the stream bank then into the Middle Fork."

- "The permit applications submitted by High Mountain Mining to [DRMS] show that the settling ponds . . . particularly Pond #4 and South Pond #3, are more likely than not infiltrating into the unconsolidated alluvium underlying these ponds and [are] likely discharging into the Middle Fork through groundwater under Pond 4 and from standing waters or wetlands downgradient from South Pond #4 and then through the culverts running under a road then into the Middle Fork."

7

- "Neither clay fines nor bentonite are likely to have sealed the [Mine] Ponds to prevent them from infiltrating pond water into the soils beneath the [Mine] Ponds . . . In order for the clay fines or bentonite to permanently seal the [Mine] Ponds they would need to have been applied in a uniform and methodical manner then compacted by machine."

- "I have reviewed three sets of sampling taken on and around the Mine property. . . . These sampling sets confirm that there are pollutants in the Mine Ponds, that pollutants are discharged from the Mine Ponds and more likely than not are being discharged into the Middle Fork through the alluvium below the [Mine] Ponds. These pollutants are discharged either through the sides or the bottoms of the [Mine] Ponds resulting in standing water or wetlands on the Mine property which subsequently discharge through culverts running under South Main Street (Colorado Highway 9) then into the Middle Fork."

(*Id.*)

3. <u>Johnson</u>

Johnson is a hydrogeologist with over 35 years of experience in hydrology and engineering. (ECF No. 83-3 at 3.) In her expert report, she opines, *inter alia*, that:

- "It is my opinion that Ponds 3 and 4, located within 70 and 90 feet, respectively, of the [Middle Fork] and approximately 20 feet above the river, are a probable source of contaminated groundwater into the [Middle Fork]. . . . According to the [April 2016 Permit Amendment], processing at the site includes the use of portable trommels and sluice boxes designed to discharge mining water and particles into the first catchment basin and then its directed into Ponds 3 and 4, which are specifically designed to 'allow for infiltration of water into the native gravels' below the ponds. . . . It is logical to conclude that the contaminated pond water which migrates vertically into the groundwater table beneath the ponds, as engineered, also contaminates the [Middle Fork] adjacent to the ponds since they are hydrologically connected."

- "Neither clay fines nor bentonite are likely to have sealed the [Mine] Ponds to prevent pond water from infiltrating into the alluvium beneath the [Mine] Ponds. There is no reference to

8

> the construction of bentonite and pond waters. . . .  In order for clay fines to adequately seal a [Mine] Pond from leakage, the clay (bentonite) needs to be applied in a uniform and methodical manner then compacted as per standard engineering methodologies and practices to create an impermeable barrier."

- "The natural streams that cross the Mine property are gaining-stream tributaries that flow into the [Middle Fork].  The Mine's overburden material mounds, roads, and operations intersect these streambeds and, in some areas, precipitation runoff and pond process water are channeled towards and into these natural streams.  These streams convey this water to and through the two culverts located at the southern end of the Mine property which empty directly into the [Middle Fork].  This water is likely to be contaminated by mining materials."

(*Id.*)

**B.     Analysis**

Defendants argue that the Court should exclude Burchell, Wilson, and Johnson's expert opinions that: (1) the Middle Fork is a "gaining" stream, or streams that cross the Mine are "gaining streams," and that ground water flows into the Middle Fork; (2) the Mine Ponds are "more likely than not . . . discharging" into the Middle Fork through "ground water" and/or from standing water or wetlands; and (3) the clay liners in the Mine Ponds are insufficient.  (ECF No. 83 at 4–8.)  They contend that Plaintiffs' retained experts do not sufficiently identify facts or data upon which they base their opinions or the principles or methods they used to reach those opinions.  (*Id.* at 4–5.)  Moreover, Defendants argue that Plaintiffs' experts are unreliable because they do not "provide[ ] hydrologic or physical evidence to demonstrate infiltration of water out of any pond that exists or existed at the Mine," or that "if water leaves any Mind [P]ond, water reaches the [Middle Fork]."  (*Id.* at 7.)  They further contend that none of Plaintiffs' experts

9

conducted any tests of the Mine Ponds' liners and failed to review DRMS's publicly available files.  (*Id.* at 8.)

In response, Plaintiffs argue that their expert witnesses have identified sufficient facts and data supporting their opinions.  (ECF No. 94 at 4–10.)  For example, they argue that their experts have relied on High Mountain's permit applications, the fact that the settling ponds do not possess synthetic liners, and the results of water sampling, in forming their opinions that the Mine Ponds are leaking and that the clay liners are insufficient.  (*Id.* at 6–10.)

The Court agrees with Plaintiffs.  Notably, Plaintiffs' retained experts rely on Defendants' own statements, eyewitness testimony, and three sets of sampling data to develop their expert opinions.  While Defendants may be able to point to potential flaws in the experts' opinions, the Court cannot conclude that Burchell, Wilson, and Johnson should be barred from discussing their conclusions and the bases for those conclusions at trial.  Defendants' objections to the experts' principles and methods go more to the weight that the Court should afford their opinions rather than their admissibility.  Accordingly, the Court denies Defendants' Motion to Exclude Retained Experts.

\* \* \* \*

The Court pauses to make an additional observation.  As set forth above, Burchell, Wilson, and Johnson have provided overlapping expert testimony regarding, *inter alia*, whether the Middle Fork is a gaining stream, whether the Mine Ponds are likely discharging pollutants into the Middle Fork, and the sufficiency of the clay liners in the Mine Ponds.  (*Cf.* ECF Nos. 83-1, 83-2, 83-3.)  Under Rule 403, the marginal probative value of allowing such duplicative testimony from three expert witnesses is

substantially outweighed by a danger of needlessly presenting cumulative evidence at trial. Accordingly, exercising its authority under Federal Rule of Evidence 611 to control the introduction of evidence and avoid duplicative testimony, the Court will allow Plaintiffs to choose only one expert to opine on each of these topics. However, the Court will not preclude more than one of Plaintiffs' expert witnesses from testifying regarding other non-cumulative matters, if any.

### III. DEFENDANTS' MOTION TO EXCLUDE NON-RETAINED EXPERTS

Pursuant to Federal Rule of Civil Procedure 26(a)(2), Plaintiffs have identified the following individuals as non-retained expert witnesses: (1) Meg Parish from the Colorado Department of Public Health & Environment Water Quality Control Division (or other person in the Department with comparable knowledge or experience); (2) Pete Cadmus, an Aquatic Toxicology Research Scientist with Colorado Parks & Wildlife (or other person with comparable knowledge or experience); and (3) "Jeff Spohn, Dawson Swanson, or other persons in the Department with comparable knowledge or experience" from Colorado Parks & Wildlife. (ECF No. 84-1 at 2–3.)

Under Rule 26(a)(2)(c),

> Unless otherwise stipulated or ordered by the court, if the witness is not required to provide a written report, this disclosure must state:
>
> (i) the subject matter on which the witness is expected to present evidence under Federal Rule of Evidence 702, 703, or 705; and
>
> (ii) a summary of the facts and opinions to which the witness is expected to testify.

Defendants request that the Court exclude Plaintiffs' non-retained expert witnesses: Meg Parish, Pete Cadmus, Jeff Spohn, and Dawson Swanson on the basis

11

that "Plaintiffs failed to produce information for any of these witnesses sufficient to comply with Fed. R. Evid. 702 or Fed. R. Civ. P. 26." (ECF No. 84 at 2.) The Court will address each witness in turn.

**A.     Parish**

Plaintiffs state that Parish will testify as follows:

> Ms. Parish, or other person in the Department with a comparable knowledge or experience, is expected to testify about the factors that determine whether a person, defined in [*sic*] include Defendants, is required to obtain a state pollutant discharge permit for discharges through groundwater into navigable waters of the United States. Specifically, Ms. Parish is expected to testify about the Western Sugar, Ouray Silver Mine, and Upper Blue Sanitation District permits that were evaluated by the Department, any studies concerning these facilities, and the factors that determined whether these facilities qualified as dischargers that were required to obtain water pollution permits. She is expected to testify about the factors that the State generally considers in evaluating whether a facility must obtain a state pollutant discharge permit, including those factors (i) set forth in the Clean Water Act, state law, and related laws and regulations, (ii) addressed in *County of Maui v. Hawaii Wildlife Fund*, 590 U.S. __, 140 S. Ct. 1462, and other factors the State considers relevant to its determination. She may be asked to opine on the applicability of these factors to the present case. She will be asked whether the clay or silts that allegedly line or have been added to Defendants' ponds have been sufficient to obviate permitting obligations for other facilities in the State.

(ECF No. 84-1 at 2–3.)

Defendants argue that Parish's disclosures are deficient and that her expert opinions are inadmissible for numerous reasons: (1) Plaintiffs have attempted to designate unidentified individuals, which violates Rule 26; (2) Parish's disclosures fail to disclose the facts and opinions that she will testify to and fail to identify her specialized knowledge and qualifications; (3) her proposed testimony is irrelevant because it is

undisputed that High Mountain does not have a state pollutant discharge permit for the Mine and this case concerns the Alma Placer Mine, not other mines or permits for other mines; and (4) Parish's disclosures contain impermissible legal opinions.  (ECF No. 84 at 5–6.)

Plaintiffs respond that the disclosures are adequate because they list distinct topics about which Parish will be asked and provide Defendants with adequate notice of the factual basis for the opinion testimony Plaintiffs will seek to introduce at trial.  (ECF No. 92 at 4–5.)  Plaintiffs further contend that the proposed testimony is relevant.  (*Id.* at 6 (arguing that the "circumstances in which the state requires pollutant discharge permits, what factors the state considers when determining if a permit is necessary, and why the state has not required a discharge permit for Defendants' operations are highly relevant to the case").)

After carefully reviewing the parties' arguments, the Court concludes that Parish's Rule 26 disclosures are deficient and include inadmissible anticipated testimony.

To the extent Plaintiffs attempt to endorse unidentified individuals as non-retained expert witnesses, such designations are improper and are therefore stricken.  After all, Rule 26(a)(2)(A) specifies that "a party must disclose to the other parties *the identity of any witness* it may use at trial to present evidence under Federal Rule of Evidence 702, 703, or 705."  Fed. R. Civ. P. 26(a)(2)(A) (emphasis added); *see also Green Earth Wellness Ctr. LLC v. Atain Specialty Ins. Co.*, 2016 WL 632051, at *2 (D. Colo. Feb. 17, 2016) ("By its plain terms, the Rule requires that a party disclose the identity of the witness, not simply a potential category of individuals from which a party

13

can later select an expert.").

Moreover, because Parish's opinions regarding the sufficiency of clay or silts in the Mine Ponds to obviate permitting requirements are based on scientific, technical, or otherwise specialized knowledge, Rule 702 applies to her opinions.  *See Nagle v. Mink*, 2011 WL 3861435, at *3 (D. Colo. Aug. 29, 2011) ("Rule 26(a)(2) addresses only the sufficiency of the disclosure.  Compliance with Rule 26(a)(2) does not resolve whether witnesses are qualified under [Rule] 702 or whether their testimony is admissible at trial.").  The Court notes that Plaintiffs do not respond to Defendants' argument that they have failed to identify any specialized knowledge or qualifications that [Parish] may have on this topic pursuant to Rule 702.  (*See* ECF No. 84 at 5–6; *see generally* ECF No. 92.)  Plaintiffs have therefore conceded the argument, and Parish is precluded from testifying regarding "whether the clay or silts that allegedly line or have been added to Defendants' ponds have been sufficient to obviate permitting obligations for other facilities in the State."

The Court further finds that to the extent Parish's opinions reach ultimate conclusions regarding Plaintiffs' Clean Water Act claim, those opinions are properly excluded.  *See United States v. Jensen*, 608 F.2d 1349, 1356 (10th Cir. 1979) ("[A]n expert witness cannot state legal conclusions by applying law to the facts, passing upon weight or credibility of the evidence, or usurping the province of the jury by telling it what result should be reached.").  Of course, state permitting requirements are, to some extent, formed by case law and applicable statutes, and "[a]n opinion is not objectionable just because it embraces an ultimate issue."  Fed. R. Evid. 704(a).  Insofar as Parish has studied these cases and statutes, they may inform her opinions.

However, the Court sees a difference between, on the one hand, Parish testifying about the holding in a particular case and applying the rule of that case to the facts at issue here and, on the other hand, Parish testifying about her understanding of the law and how it impacts her understanding of how the State determines whether a facility must obtain a state pollutant discharge permit. The Court will permit testimony which constitutes the latter; the former is impermissible.

Finally, the Court finds that although Parish's disclosures list the *topics* upon which she will be questioned, her disclosures are deficient under Rule 26(a)(2)(c) because they do not summarize the "facts and opinions to which the witness is expected to testify." Rule 26(a)(2)(C) disclosures are meant to define the scope of expert testimony so that an opposing party can be prepared to address the opinions proffered. *See Green Earth Wellness Center*, 2016 WL 632051, at *3. Plaintiffs' disclosures fall short because they fail to identify any of Parish's anticipated expert opinions.

Violations of Rule 26(a)(2) are addressed by courts pursuant to Federal Rule of Civil Procedure Rule 37(c):

> If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at hearing, or at a trial, unless the failure was substantially justified or is harmless. In addition to or instead of this sanction, the court, on motion and after giving an opportunity to be heard:
>
> (A) may order payment of the reasonable expenses, including attorney's fees, caused by the failure;
>
> (B) may inform the jury of the party's failure; and
>
> (C) may impose other appropriate sanctions, including

any of the orders listed in Rule 37(b)(2)(A)(i)–(iv).

Fed. R. Civ. P. 37(c)(1).  The determination as to whether a Rule 26(a) violation is justified or harmless is entrusted to the broad discretion of the court.  *Woodworker's Supply, Inc. v. Principal Mt. Life Ins. Co.*, 170 F.3d 985, 993 (10th Cir. 1999).  In exercising its discretion, a court's consideration is guided by the following four factors: (1) the prejudice or surprise to the impacted party; (2) the erring party's ability to cure the prejudice; (3) the potential for trial disruption; and (4) the erring party's bad faith or willfulness.  *Id.*

Inexplicably, Plaintiffs do not advance an argument under Rule 37 that any alleged deficiencies in Parish's disclosures were substantially justified or are harmless.  Based on this failure, the Court could exclude Parish's trial testimony.  Nonetheless, solely in the interest of justice, the Court will permit Plaintiffs to supplement their Rule 26(a)(2)(c) disclosures for Parish to identify the facts and opinions to which the witness is expected to testify for the topics already disclosed by no later than January 21, 2022.  Provided that Parish's disclosures meet the requirements of Rules 26 and 702, she will be permitted to testify as a non-retained expert witness at trial.[1]

Accordingly, this portion of the Defendants' Motion to Exclude Non-Retained Experts is granted in part and denied in part as set forth herein.

**B.      Cadmus, Spohn, and Swanson**

Plaintiffs represent that Cadmus will testify as follows:

> Mr. Cadmus, or other person with comparable knowledge or experience, is expected to present evidence concerning the results of sampling conducted, and subsequent testing, of the water in at least one settling pond at the Alma Placer Mine, presumably Pond 4, on or around October 3, 2014.

---

[1] The Court will address objections to the relevancy of Parish's testimony, if any, at trial.

> This witness is also expected to identify the pollutants determined to exist in Pond 4, their values, and the significance thereof with respect to government standards in effect.

(ECF No. 84-1 at 3.)

Plaintiffs further state that Spohn or Swanson will testify as follows:

> Mr. Spohn, Mr. Swanson, or another person with comparable knowledge or experience, is expected to present evidence concerning the results of sampling conducted, and subsequent testing, of the water in at least one settling pond at the Alma Placer Mine on or around October 3, 2014. This witness is also expected to identify Pond 4 as the Defendants' settling pond that was sampled at the Alma Placer Mine. This witness is also expected to identify the pollutants determined to exist in Pond 4, their values, and the significance thereof with respect to government standards in effect.

(*Id.*)

Defendants argue that any testimony from Cadmus, Spohn, or Swanson is irrelevant because Plaintiffs have failed to explain how any October 3, 2014 testing supports an ongoing Clean Water Act violation. (ECF No. 84 at 7–8.) In response, Plaintiffs do not explicitly address the relevance of testimony regarding the October 3, 2014 testing to the present case. (*See generally* ECF No. 92.) Indeed, Plaintiffs admit in their response to Defendants' Motion for Summary Judgment that they "are not seeking a permit or penalties" for Defendants' October 3, 2014 discharge of pollutants into the Middle Fork. (ECF No. 109 at 27.)

In light of Plaintiffs' admissions that the October 3, 2014 discharge was a "one-time" discharge for which they are not seeking penalties, the Court finds that testimony regarding the results of water sampling on October 3, 2014 is not relevant to the determination of whether Defendants are engaging in an *ongoing* violation of the Clean

17

Water Act.² In making this relevancy determination, the Court notes that a different judge within the District of Colorado has already dismissed a separate case relating to the 2014 discharge on the basis that "the October 2014 discharge has ceased, making it a wholly past violation." *See* Order, *Stone et al. v. High Mountain Mining Co., LLC*, Civil Action No. 17-cv-1295-RM-KMT (July 25, 2018), ECF No. 28; *see also Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 64 (1987) (recognizing that the Clean Water Act "does not permit citizen suits for wholly past violations").

Accordingly, the Court excludes the non-retained expert testimony from Cadmus, Spohn, and Swanson.

## IV. MOTION FOR SUMMARY JUDGMENT

Summary judgment is warranted under Federal Rule of Civil Procedure 56 "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986). A fact is "material" if, under the relevant substantive law, it is essential to proper disposition of the claim. *Wright v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001). An issue is "genuine" if the evidence is such that it might lead a reasonable trier of fact to return a verdict for the nonmoving party. *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997).

In analyzing a motion for summary judgment, a court must view the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party.

---

² Even if the Court did not exclude the testimony on this basis, the Court would still find that this testimony must be excluded because Plaintiffs have not attempted to demonstrate that Cadmus, Spohn, and Swanson meet Rule 702 requirements, namely that they have specialized knowledge or have utilized reliable principles and methods analyzing the October 3, 2014 water sampling.

*Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). In addition, the Court must resolve factual ambiguities against the moving party, thus favoring the right to a trial. *See Houston v. Nat'l Gen. Ins. Co.*, 817 F.2d 83, 85 (10th Cir. 1987).

To prove a violation of the Clean Water Act, Plaintiffs must prove that Defendants: (1) discharged (2) a pollutant (3) into navigable waters (4) from a point source (5) without a permit. *Sierra Club v. El Paso Gold Mines, Inc.*, 421 F.3d 1133, 1142 (10th Cir. 2005); 33 U.S.C. §§ 1311(a), 1342(a)(1).

The Court has fully reviewed the parties' arguments regarding summary judgment. Viewing the evidence and drawing all reasonable inferences in the light most favorable to the nonmoving party, the Court concludes that there are genuine disputes of material fact regarding whether Defendants are discharging pollutants into the Middle Fork. For example, notwithstanding Defendants' arguments that Plaintiffs have failed to provide any evidence of discharge of pollutants into the Middle Fork, the Court notes that Plaintiffs cite, *inter alia*: (1) affidavits from witnesses averring that they have seen culverts convey water from Defendants' property into the Middle Fork (*see* ECF No. 20-3 ¶ 6; ECF No. 20-7 ¶¶ 3, 6; ECF No. 59-1 ¶¶ 5–7); (2) reports from expert witnesses opining that the Middle Fork contains elevated levels of pollutants in the areas surrounding the Mine (*see, e.g.*, ECF No. 105-18); and (3) and a report from Collier Geophysics—which conducted geophysical investigations at Mine Ponds 3 and 4 and detected "subsurface [ ] anomalies [ ] related to seepage conditions from the upgradient pond" and "appreciable signal penetration"—opining that "it can be inferred that the sub-bottom materials are not composed of highly attenuating materials, such as clay-

dominated sediments" (ECF No. 105-23).  The parties' factual disputes must be resolved at trial.

Accordingly, the Court denies the Motion for Summary Judgment.

### V. CONCLUSION

For the reasons set forth above, the Court ORDERS as follows:

1. Defendants' Motion to Exclude Certain Opinions of Plaintiffs' Retained Expert Witnesses Under Fed. R. Evid. 702 (ECF No. 83) is DENIED;

2. Defendants' Motion to Exclude Plaintiffs' Non-Retained Expert Witnesses Under Fed. R. Evid. 702 (ECF No. 84) is GRANTED IN PART and DENIED IN PART as set forth above;

3. Plaintiffs are GRANTED LEAVE to supplement their Rule 26(a)(2)(c) disclosures to identify the facts and opinions to which Meg Parish is expected to testify for the topics already disclosed by no later than **January 21, 2022**;

4. Plaintiffs' Motion to Exclude Certain Opinions of Defendants' Retained Experts Greg Lewicki and James R. Murray Under FRE 702 (ECF No. 87) is DENIED; and

5. Defendants' Motion for Summary Judgment (ECF No. 105) is DENIED.

Dated this 7th day of January, 2022.

BY THE COURT:

_____
William J. Martínez
United States District Judge